IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Zina Manning, ) | |
|                           ) | Civil Action No. 6:04-22301-TLW-WMC |
| Plaintiff, ) | |
|                           ) | **REPORT OF MAGISTRATE JUDGE** |
| vs.                  ) | |
|                           ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
|                           ) | |
| Defendant. ) | |
|                           ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff, proceeding *pro se*, brought this action pursuant to Sections 205(g) and 1631©)(3) of the Social Security Act, as amended, 42 U.S.C. Section 405(g) and 1383©)(3), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB") or supplemental security income ("SSI") benefits.

**ADMINISTRATIVE PROCEEDINGS**

On July 14, 2001, the plaintiff filed applications for DIB and SSI alleging disability beginning April 21, 1999. The applications were denied initially and on reconsideration. On July 3, 2002, the plaintiff requested a hearing, which was held on

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

February 13, 2004. Following the hearing, at which the plaintiff, her attorney,[2] and a vocational expert appeared, the administrative law judge considered the case *de novo*, and on April 29, 2004, determined that the plaintiff was not entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on July 19, 2004.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1)     The claimant meets the non-disability requirements for a period of disability and Disability Insurance benefits as set forth in §216(I) of the Social Security Act, and is insured for benefits through June 30, 2006.
>
> (2)     The claimant has not engaged in substantial gainful activity since April 21, 1999, the alleged onset date.
>
> (3)     The claimant's obesity, chronic left knee pain, depression and coronary artery disease are impairments considered "severe," based on the criteria in the Regulations at 20 CFR §§404.1520(b) and 416.920(b).
>
> (4)     The claimant's severe impairments do not meet or medically equal the criteria of any listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> (5)     The claimant's testimony did not support a finding of disability.
>
> (6)     All the medical opinions regarding the severity of the claimant's impairments have been carefully considered (20 CFR §§404. 1527 and 416.927).
>
> (7)     The claimant has the residual functional capacity to perform a wide range of unskilled, entry-level at least "sedentary" work, and semi skilled sedentary work for which she has transferable skills as defined by 20 CFR §§404.1567 and 416.967.
>
> (8)     The claimant is unable to perform any of her past relevant work (20 CFR §§404.1565 and 416.965).

---

[2]The plaintiff was represented by an attorney at the administrative level.

(9) The claimant is "a younger individual" (20 CFR §§404.1563 and 416.963).

(10) The claimant has a high school education (20 CFR §§404.1564 and 416.964).

(11) The claimant has transferable skills.

(12) Although the claimant's limitations may not allow her to perform the full range of sedentary work. using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.

(13) The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§404.1520(f) and 416.920(f)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The record reveals that the plaintiff was born on December 17, 1962, and was 41 years old at the time of her hearing. She has a high school education, and has worked as a corrections officer and forklift driver. She alleges disability as of April 21, 1999, due to obesity, chronic left knee pain, depression, anxiety, recurrent headaches, hypertension and coronary artery disease.

The plaintiff testified that she tripped and twisted her knee while at work (Tr. 408). The record contains a report indicating that the plaintiff was seen in the emergency room in April 1999 complaining of left knee pain. An MRI of the knee showed some effusion, and an arthroscopy was recommended (Tr. 109-111). In October 1999, the plaintiff underwent exploratory left knee arthroscopy and was diagnosed with patellar pain, status post dislocation (Tr. 114-122).

The plaintiff was hospitalized for four days in December 1999 for treatment of a myocardial infarction and coronary artery disease. Heart catheterization revealed 95% stenosis of the left circumflex artery, and an angioplasty and stent placement were performed (Tr. 123-38).

In March 2000, the plaintiff reported to the emergency room complaining of chest pain. She was diagnosed with unstable angina and to rule out ischemia (Tr. 139-54). In April 2000, the plaintiff's physical therapist, Alex Arab, completed a functional capacity evaluation, in which he assessed the plaintiff's ability at from light to medium (Tr. 155).

Progress notes from Dr. Mottie Skinner indicated that the plaintiff was seen periodically between April 1999 and April 2001 for treatment of coronary artery disease, occasional chest pain, anxiety, shortness of breath and knee pain. The plaintiff weighed approximately 220 pounds at a height of 64 inches and was deemed "obese" (Tr. 156-95).

In September 2001, the plaintiff underwent a consultative examination by Dr. J. Phil Wallace, to whom she complained of left knee pain, coronary artery disease and chest pain. The plaintiff admitted smoking one-half pack of cigarettes per day. On physical examination, the plaintiff weighed 218 pounds at a height of 64 inches. Her blood pressure was 140/80. She had good range of motion and 5/5 strength throughout the body, including the knees. X-rays of the left knee and of the chest were negative. Dr. Wallace diagnosed coronary artery disease and a probable left meniscus tear with no functional abnormalities (Tr. 197-200).

In September 2001, the plaintiff underwent a consultant at examination by Dr. Al B. Harley, Jr., to whom she complained of auditory hallucinations, agitation, sleepiness, headaches and difficulty tolerating "nitpicking" at work. On clinical examination, the plaintiff demonstrated estimated average intelligence. Her memory was intact; however, Dr. Harley felt that she "did not try very hard" on the cognitive testing questions. Dr. Harley was not particularly impressed with the validity of her described auditory hallucination. The plaintiff's affect was somewhat flat, and was diagnosed with an adjustment disorder. Dr. Harley opined that the plaintiff had moderate restrictions in her thought processes, but that she was only mildly impaired in her ability to relate to others and in her daily activities (Tr. 201-03).

The plaintiff was seen in the emergency room in November 2001 complaining of headaches, dizziness, a peculiar feeling on the right side of the face and heaviness in the right arm and leg. Computed tomography (CT) of the head was negative and x-rays of the chest revealed no acute findings and only minimal cardiomegaly (Tr. 204-212).

In September 2001, the plaintiff had normal magnetic resonance imaging (MRI) of the left knee. She went into physical therapy to strengthen the knee in November and December 2001 (Tr. 213-27). In March 2002, the plaintiff apparently had an additional arthroscopy on the left knee. When she followed up with Dr. Eric Heimberger following surgery, the plaintiff was pleased with her progress and reported reduced pain (Tr. 220-27).

A Cardiolite stress test in December 2001 revealed some signs of ischemia and an ejection fraction of normal at 49% (Tr. 228-45). The plaintiff was hospitalized for two days in April 2002 for treatment of pneumonia (Tr. 246-55).

In April and May 2002, the plaintiff underwent physical therapy for her left knee following surgery. She progressed eventually to a home walking program, reportedly ambulating independently with a good gait (Tr. 292-98).

In October 2002, the plaintiff was hospitalized for two days for treatment of bronchitis and non-cardiac chest pain (Tr. 299-313).

The plaintiff was followed at Dillon Family Medicine from April 2000 to June 2003 and was treated for chest pain, shortness of breath, and anxiety (Tr. 320-27). Magnetic resonance imaging (MRI) of the knee in April 2003 revealed mild soft-tissue swelling, no joint effusion and a possible tear of the anterior cruciate ligament (Tr. 318-19). In June of 2003, x-rays of her chest showed normal heart size, no pneumonia, no effusion, no bony lesion in the vertebral spine. She was diagnosed with muscular strain. She had been lifting her grandchild (Tr. 320-27). Dr. Timothy Fitzgibbon saw the plaintiff in September and December 2003 for complaints of chest pain and headaches. The chest pains were improved with the use of nitroglycerin. The headaches were intermittent and

were apparently attributed to the plaintiff's hypertension and coronary artery disease (Tr. 328-29).

In September 2003, the plaintiff was hospitalized for two days for treatment of coronary artery disease, hypertension, and pneumonia. Tests were negative for myocardial damage. A Cardiolite stress test showed no signs of ischemia; however, the plaintiff's calculated ejection fraction was 39 percent (Tr. 330-81).

State agency physicians who reviewed the evidence in October 2001 and June 2002 determined that the plaintiff could perform a range of work requiring medium exertion (Tr. 256-57; 269-76). In October 2001, Dr. Manhal Wieland, a reviewing psychological consultant, reviewed the evidence and completed a Psychiatric Review Technique Form. he determined that the plaintiff did not have a severe mental impairment (Tr. 268; 277-91). In May 2002, Dr. Edward D. Waller affirmed Dr. Wieland's assessment (Tr. 258, 291).

The plaintiff testified at the hearing that she has had three heart attacks and she has had surgery on the left knee, due to a work-related injury (Tr. 427-32). She stated that she takes medications to control her cholesterol, headaches, anxiety, heart disease and back pain (Tr. 412). The plaintiff's medications include: Toprol XL (a beta-blocker used to treat heart failure, chest pain, and high blood pressure); Pravachol (high cholesterol); Zoloft (depression); Xanax (anxiety and panic disorders); Altace (high blood pressure); Nitroglycerin (chest pain); aspirin; Furosemide (fluid); and potassium (pl. brief 3). The plaintiff stated that the side effects of these medications include drowsiness and the inability to drive more than short distances (Tr. 411). She stated that, due to knee pain, she cannot climb, crawl, squat, or run. She related that she can stand comfortably for no longer than 30 minutes at a time, after which she must sit for approximately 15 to 20 minutes (Tr. 415-19). The plaintiff related that she could lift nothing heavier than 10 pounds and that she is chronically anxious (Tr. 422-23).

Vocational expert Carey Alexander Washington testified at the hearing (Tr. 446-53). In response to the ALJ's hypothetical, he testified that a person of the plaintiff's age (41 years old), education, and work history, and the residual functional capacity ("RFC") for sedentary work allowing the individual the opportunity to shift positions or ultimately sit and stand, could perform the unskilled jobs of surveillance systems monitor, laundry folder/ inspector, and weigher and had the transferable skills for such jobs as bench assembler. According to the vocational expert, these jobs would not require contact with the general public (Tr. 450-52). When questioned by the plaintiff's attorney, the vocational expert testified that the jobs he identified would not be available if the hypothetical individual was also unable to come into work or had to leave work early 2-3 times every week, or had to be out once a week for an extended period of time for medical appointments (Tr. 452-53).

## ANALYSIS

Substantial evidence supports the ALJ's finding that the plaintiff retained the RFC to perform a wide range of unskilled, entry-level sedentary work and semi-skilled sedentary work for which she has transferable skills (Tr. 21). Significantly, no treating physician has expressed an opinion regarding the plaintiff's functional capacity or on the issue of disability (Tr. 19). As discussed above in the statement of facts, the plaintiff had good range of motion and 5/5 strength throughout the body, including the knees, and x-rays of the left knee and of the chest were negative in September 2001. Dr. Wallace diagnosed coronary artery disease and a probable left meniscus tear with no functional abnormalities (Tr. 197-200). After arthroscopic surgery and physical therapy to increase strength in her left knee, the plaintiff's range of motion was not significant limited, and she was able to walk normally (Tr. 125, 155, 197-198, 214-219, 221, 225-226, 292-298). In fact, the plaintiff's physical therapist completed a functional capacity evaluation in April 2000 in which he assessed the plaintiff with the ability to perform full-time work activities requiring light to

9

medium exertion (Tr. 155). After an angioplasty and stent, the plaintiff's heart condition was managed with medication and did not result in disabling functional limitations (Tr. 198, 211).

Further, State agency physicians who reviewed the medical evidence determined that the plaintiff, despite her physical impairments, could perform work requiring medium exertion (Tr. 256-267, 269-276). This evidence provided additional support for the ALJ's finding that the plaintiff could perform the much lesser requirements of a reduced range of sedentary work activities.

The medical evidence also supported the ALJ's finding that the plaintiff's medically determinable mental impairments were not disabling. Dr. Harley found that the plaintiff was of average intelligence with intact memory, and that she was "doing pretty well, . . . from an emotional standpoint" (Tr. 202). Medical progress notes dated during the five-year period relevant to this case indicated that the plaintiff's anxiety attacks were intermittent, treated with medication, and related to nonmedical and/or isolated situations. For example, the plaintiff reported her symptoms were worse when her adult children came home, and that her most recent and worst attack occurred when her daughter was involved in a motor vehicle accident (Tr. 423-434). Also, there is a lack of any evidence showing that the plaintiff received significant and ongoing treatment for depression during the time period relevant to this case. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).

Further supporting the ALJ's decision, State agency psychological consultants who reviewed the medical evidence determined that the plaintiff did not have a severe mental impairment (Tr. 258, 268, 277-291). This evidence provided additional support for the ALJ's finding that the plaintiff could perform at least unskilled work that did not require interaction with the general pubic (Tr. 19-21).

The ALJ found that the plaintiff's testimony "as it related to alleged side affects of medication and physical limitations, was inconsistent with the weight of the medical evidence, was not wholly credible, and therefore failed to support a finding of disability" (Tr.

10

19). A claimant's allegations of pain, disability and limited function itself, or its severity, need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges she suffers. A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529©)(4) and 416.929©)(4). Furthermore, "a formalistic factor by factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence he relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).

Nonmedical evidence, in addition to the medical evidence cited above, supports the ALJ's finding that the plaintiff's testimony was not fully credible. Specifically, although the plaintiff claimed that her impairments resulted in the inability to work since April 21, 1999, she continued to work full-time until January 12, 2001 (Tr. 66-67, 202, 409). Further, the plaintiff's inability to perform her past work as a correctional officer, which required her to stand most of the day and work 12-hour shifts, did not mean that she was totally and permanently disabled from all work. In fact, the plaintiff herself stated she received a worker's compensation settlement and that she was looking for other work, but she did not think employers would hire her (Tr. 408-411). As noted by the defendant, while the plaintiff testified that she spent most of her time lying down and resting, the record indicates that none of her treating or examining physicians even limited her activities, and her physical examinations repeatedly revealed that she had normal muscle strength, without atrophy (def. brief 18). Also, the plaintiff's physicians advised her that if she exercised, dieted, and quit smoking, which she did not do, her condition would improve. In limiting the plaintiff to unskilled, sedentary work that did not require interaction with the

general public, the ALJ properly considered the plaintiff's credible limitations (i.e., her ability to lift up to 10 pounds) into the assessment of her RFC.

Based upon the evidence, the ALJ properly found that the plaintiff retained the RFC to perform a wide range of unskilled entry-level sedentary work and semi-skilled sedentary work for which she has transferable skills.  The ALJ received testimony from a vocational expert to assist her in determining whether there were jobs that could accommodate the plaintiff's assessed limitations.  The vocational expert testified that even if the plaintiff also needed the opportunity to change positions and/or a sit/stand option, she would still be able to perform the identified jobs (Tr. 449-51).  The ALJ properly relied on the vocational expert's testimony when finding that the plaintiff was not disabled because she could perform jobs existing in significant numbers in the national economy.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court concludes that the findings of the ALJ are supported by substantial evidence and recommends that the decision of the Commissioner be affirmed.

s/William M. Catoe
United States Magistrate Judge

October 28, 2005

Greenville, South Carolina